## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| **DONNA KEYES**, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **KEYSTONE TECHNOLOGIES GROUP, LLC**, and **MERCY HEALTH PHYSICIANS KENTUCKY SPECIALTY CARE, LLC**, <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Donna Keyes ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Keystone Technologies Group, LLC ("Keystone") and Mercy Health Physicians Kentucky Specialty Care, LLC ("Mercy Health") (collectively, "Defendants"), and alleges the following based on personal knowledge as to her own actions and experiences, and, as to all other matters, upon information and belief based on the investigation of counsel, including review of publicly available information and the notice letter Plaintiff received from Defendants.

### I. INTRODUCTION

1. This class action arises out of two cybersecurity incidents (collectively, the "Data Breach") that occurred on computer systems hosted by Defendant Keystone Technologies Group, LLC — a third-party healthcare information-technology vendor that provided managed services to the Orthopaedic Institute of Western Kentucky ("OIWK"), which is now operated by Defendant

Mercy Health Physicians Kentucky Specialty Care, LLC as Mercy Health – Western Kentucky Orthopedics. The systems housed the protected health information ("PHI") and personally identifiable information ("PII") (collectively, the "Private Information") of Plaintiff and other current and former patients of OIWK and Mercy Health.

2. On February 25, 2026, Defendants sent Plaintiff and other affected patients a notice letter stating that unauthorized third parties had gained access to Keystone-hosted systems during two separate time windows: (1) between April 21, 2025, and April 26, 2025; and (2) between July 19, 2025, and August 1, 2025. The notice letter states that, during those windows, the unauthorized third parties "obtained certain files" containing Private Information. The notice letter was sent nearly seven months after the end of the second access window.

3. According to the notice letter, the Private Information compromised in the Data Breach included Plaintiff's name and one or more of the following categories of information: date of birth, address, medical record number, health insurance information, and treatment information. Upon information and belief, and as reflected in a sample notice letter filed by Defendants with the Massachusetts Attorney General's Office on or about March 5, 2026, the Private Information compromised in the Data Breach also included, for some Class Members, Social Security numbers.[1]

4. The Data Breach resulted from Defendants' failure to implement and maintain reasonable and adequate cybersecurity measures sufficient to protect the Private Information entrusted to them. Keystone, as the vendor hosting the data, failed to maintain reasonable safeguards over the systems on which it stored Plaintiff's and Class Members' Private Information.

---

[1] Off. of the Mass. Att'y Gen., Data Breach Report No. 2026-328, Orthopaedic Institute of Western Kentucky (Mar. 5, 2026), https://www.mass.gov/doc/2026-328-orthopaedic-institute-of-western-kentucky/download.

Mercy Health, as the healthcare provider that collected the Private Information from its patients and entrusted it to Keystone, failed to ensure that its vendor maintained reasonable safeguards.

5.      Plaintiff and Class Members provided their Private Information to Defendants as a necessary condition of receiving medical care. They did so with the reasonable expectation — reinforced by Defendants' status as a healthcare provider subject to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations — that Defendants would safeguard their Private Information in a manner consistent with industry standards and the law.

6.      Plaintiff's and Class Members' Private Information was maintained on Keystone's systems in a manner vulnerable to unauthorized access. Upon information and belief, the unauthorized actors responsible for the Data Breach were cybercriminals who specifically targeted the Private Information held by Defendants for exfiltration, misuse, and sale on illicit markets.

7.      Since the Data Breach, Plaintiff has been notified by Experian that her Private Information has been detected on the dark web. She has also experienced a significant and sustained increase in unsolicited telephone calls and unsolicited electronic-mail communications, consistent with the known use of exfiltrated breach data for targeted spam, phishing, and fraud attempts.

8.      Plaintiff and Class Members now face a substantial and continuing risk of identity theft and fraud. Stolen PHI — particularly when combined with names, dates of birth, and, for many Class Members, Social Security numbers — has significant and enduring value on illicit markets and can be used to commit medical identity theft, financial-account fraud, tax fraud,

employment fraud, and other crimes that may not be detected for months or years after the initial compromise.[2]

9.     Plaintiff and Class Members have been forced to expend and will continue to expend time and money to mitigate the harms caused by the Data Breach, including by monitoring their financial accounts and credit reports, obtaining credit monitoring and identity-theft protection services, and taking other reasonable protective measures. Defendants have not offered to compensate Plaintiff or Class Members for these costs.

10.     Defendants had ample reason to know that a Data Breach of this type was reasonably foreseeable. The healthcare sector has been repeatedly identified by federal agencies — including the Cybersecurity and Infrastructure Security Agency ("CISA") and the U.S. Department of Health and Human Services ("HHS") — as a primary target of cybercriminals, and the Identity Theft Resource Center has reported that the healthcare sector accounts for a disproportionate share of reported data compromises.[3]

11.     Defendants also had ample reason to know how to prevent a Data Breach of this type. Authoritative cybersecurity frameworks published by the National Institute of Standards and Technology ("NIST"), CISA, the Center for Internet Security, and HHS describe, in detail, the reasonable administrative, technical, and physical safeguards that healthcare providers and their business associates should implement to protect PHI.[4]

---

[2] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737.

[3] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf; U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf; Identity Theft Res. Ctr., 2025 Data Breach Report (Jan. 2026), https://www.idtheftcenter.org/publication/2025-data-breach-report/.

[4] Joint Task Force, Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Publication 800-53, Rev. 5 (Sept. 2020) (includes updates as of Dec. 10, 2020),

12. Plaintiff brings this action on behalf of herself and a Class of similarly situated individuals whose Private Information was compromised in the Data Breach. Plaintiff seeks damages, equitable relief, and other relief to remedy the harm caused by Defendants' conduct.

13. Plaintiff asserts the following causes of action against Defendants: (i) negligence; (ii) breach of implied contract; (iii) unjust enrichment (pled in the alternative); and (iv) declaratory judgment under 28 U.S.C. § 2201.

## II. PARTIES

14. Plaintiff Donna Keyes is, and at all times relevant to this Complaint was, a citizen and resident of Paducah, Kentucky. Plaintiff was a patient of OIWK and its successor, Mercy Health — Western Kentucky Orthopedics, and provided her Private Information to Defendants in connection with receiving orthopedic medical care.

15. Defendant Keystone Technologies Group, LLC is a Missouri limited liability company with its principal place of business in Eureka, Missouri. Keystone is a healthcare information-technology consulting and services firm that provides managed services — including data conversion, electronic medical record hosting, legacy data archival, cloud computing, network infrastructure, and cybersecurity services — to healthcare organizations across the United States.[5]

16. Defendant Mercy Health Physicians Kentucky Specialty Care, LLC is a Kentucky nonprofit limited liability company organized on April 28, 2020, with its principal office at 1530 Lone Oak Road, Paducah, Kentucky 42003. Its registered agent for service of process is

---

https://doi.org/10.6028/NIST.SP.800-53r5; Nat'l Inst. of Standards & Tech., Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final; Ctr. for Internet Sec., CIS Critical Security Controls v8.1 (2024), https://www.cisecurity.org/controls/v8-1; U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf.

[5] Keystone Technologies, About Us, https://keystonetechnologies.com/about-us/ (last visited Apr. 13, 2026); Keystone Technologies, Services, https://keystonetechnologies.com/services/ (last visited Apr. 13, 2026).

Corporation Service Company, 315 High Street, Frankfort, Kentucky 40601. Mercy Health operates the orthopedic practice formerly known as the Orthopaedic Institute of Western Kentucky, which Mercy Health acquired effective January 1, 2024, and which now operates as Mercy Health – Western Kentucky Orthopedics. Mercy Health is a healthcare provider and, on information and belief, a 'covered entity' within the meaning of HIPAA and its implementing regulations, 45 C.F.R. § 160.103.[6]

17.    On information and belief, Keystone served as a business associate of Mercy Health and its predecessor OIWK within the meaning of 45 C.F.R. § 160.103, and in that capacity received, stored, and processed the Private Information of Mercy Health's and OIWK's current and former patients, including Plaintiff.

### III. JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 members; and at least one member of the proposed Class (including Plaintiff, who is a citizen of Kentucky) is a citizen of a State different from at least one Defendant (Keystone, which is a citizen of Missouri).

19.    This Court has personal jurisdiction over Defendant Keystone because Keystone is a Missouri limited liability company headquartered in this District. This Court has personal jurisdiction over Defendant Mercy Health because Mercy Health purposefully directed the Private

---

[6] Mercy Health Acquires Orthopedic Institute of Western Kentucky, WPSD Local 6 (Jan. 11, 2024), https://www.wpsdlocal6.com/news/mercy-health-acquires-orthopedic-institute-of-western-kentucky/article_fe65bb0e-aff0-11ee-9952-230a5c6bd6b4.html; Mercy Health, Mercy Health — Western Kentucky Orthopedics, https://www.mercy.com/locations/specialty-locations/orthopedics-sports-medicine-spine/mercy-health-western-kentucky-orthopedics (last visited Apr. 13, 2026).

Information of its patients — including Plaintiff's — to Keystone's systems located in this District, with the knowledge and intent that such information would be stored, processed, and maintained on those systems. A substantial part of the events, omissions, and injuries giving rise to Plaintiff's claims, including the unauthorized access to, and exfiltration of, Private Information from Keystone's systems, occurred in this District.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant Keystone resides in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims, including the unauthorized access to Keystone's systems and the exfiltration of Private Information from those systems, occurred in this District.

21.     Assignment to the Eastern Division is proper under E.D. Mo. L.R. 2.07 because Keystone maintains its principal place of business in Eureka, Missouri, which lies within St. Louis County and the Eastern Division of this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendants and the Private Information They Collected and Maintained

22.     Defendant Keystone is a healthcare information-technology consulting and services firm that, on information and belief, has provided managed services to healthcare organizations for more than twenty years. [7] Keystone markets itself as a provider of specialized services to healthcare organizations, including data conversion, electronic medical record hosting, legacy data archival, HIPAA-compliant cloud computing, network infrastructure, and cybersecurity services for large health systems, multi-practice physician groups, and senior-living providers across the country. [8]

---

[7] Keystone Technologies, About Us, https://keystonetechnologies.com/about-us/ (last visited Apr. 13, 2026).
[8] Keystone Technologies, Services, https://keystonetechnologies.com/services/ (last visited Apr. 13, 2026).

23.     Defendant Mercy Health is a specialty orthopedic practice located in Paducah, Kentucky. Mercy Health operates the practice formerly known as the Orthopaedic Institute of Western Kentucky, which Mercy Health acquired effective January 1, 2024. Mercy Health markets itself as the region's largest orthopedic service provider, offering a comprehensive range of musculoskeletal care including general orthopedics, sports medicine, foot-and-ankle care, hand-and-wrist care, hip-and-knee care, pain management, podiatry, imaging, surgery, and rehabilitation therapy.[9]

24.     Plaintiff and Class Members are current and former patients of OIWK and Mercy Health whose Private Information was stored on systems hosted by Keystone.

25.     As a condition of receiving orthopedic medical care, Mercy Health and its predecessor OIWK required patients, including Plaintiff and Class Members, to provide their Private Information. The Private Information that Mercy Health and OIWK required patients to provide included, at a minimum: names; dates of birth; addresses; telephone numbers; email addresses; health insurance information; employer information; emergency contact information; medical record numbers; medical history and prior diagnoses; and treatment information. Upon information and belief, and as reflected in the sample notice letter filed with the Massachusetts Attorney General, the Private Information collected and maintained by Mercy Health and OIWK also included, for certain patients, Social Security numbers.[10]

26.     On information and belief, Mercy Health and OIWK transmitted the Private Information of their current and former patients — including Plaintiff — to Keystone, which stored

---

[9] Mercy Health Acquires Orthopedic Institute of Western Kentucky, WPSD Local 6 (Jan. 11, 2024), https://www.wpsdlocal6.com/news/mercy-health-acquires-orthopedic-institute-of-western-kentucky/article_fe65bb0e-aff0-11ee-9952-230a5c6bd6b4.html; Mercy Health, Mercy Health — Western Kentucky Orthopedics, https://www.mercy.com/locations/specialty-locations/orthopedics-sports-medicine-spine/mercy-health-western-kentucky-orthopedics (last visited Apr. 13, 2026).

[10] Off. of the Mass. Att'y Gen., Data Breach Report No. 2026-328, Orthopaedic Institute of Western Kentucky (Mar. 5, 2026), https://www.mass.gov/doc/2026-328-orthopaedic-institute-of-western-kentucky/download.

and processed that information on systems located at or controlled from Keystone's headquarters in Eureka, Missouri.

27.     On information and belief, at the time of the Data Breach, the Private Information of Plaintiff and Class Members that was held on Keystone's systems was unencrypted, or was protected only by inadequate access controls that did not prevent unauthorized acquisition.

28.     Plaintiff and Class Members provided their Private Information to Defendants on the reasonable expectation that Defendants — as a sophisticated healthcare provider and its specialized information-technology vendor — would use reasonable and appropriate measures to keep that information confidential, would use that information only for legitimate healthcare and business purposes, and would make only authorized disclosures of that information.

29.     Plaintiff and Class Members take reasonable care to protect the confidentiality of their Private Information, and they would not have entrusted their Private Information to Defendants had they been aware of Defendants' inadequate data-security practices.

30.     Defendants had obligations — arising from their status as a HIPAA covered entity and business associate, from the Federal Trade Commission Act, from industry standards, and from representations made to their patients — to safeguard the Private Information of Plaintiff and Class Members and to protect that information from unauthorized access, acquisition, or disclosure. See 15 U.S.C. § 45(a).

**B. The Data Breach**

31.     On February 25, 2026, Mercy Health sent a notice letter to Plaintiff and other affected patients (the "Notice Letter") informing them that the computer systems hosted by Keystone had been accessed by unauthorized third parties.

32.    The Notice Letter states that Keystone "is a healthcare IT consulting and services firm that provided managed services for OIWK," and that Defendants "recently learned of two cybersecurity incidents that occurred on certain computer systems hosted by Keystone Technologies."

33.    The Notice Letter further states that the investigation of the two cybersecurity incidents "determined that unauthorized third-parties gained access to the systems between (1) April 21, 2025, and April 26, 2025, and obtained certain files, and (2) July 19, 2025, and August 1, 2025, and obtained certain files." The Notice Letter thus identifies two separate windows of unauthorized access and exfiltration, separated by approximately two-and-a-half months.

34.    The Notice Letter states that Defendants "conducted a detailed review and analysis of the files involved and, on December 8, 2025, and January 15, 2026, identified certain OIWK patient information." On information and belief, Defendants thus completed their initial review of the files obtained by the unauthorized third parties no later than January 15, 2026.

35.    Despite identifying affected patient information no later than January 15, 2026, Defendants did not send notice of the Data Breach to Plaintiff and Class Members until February 25, 2026 — approximately six months after the end of the second access window on August 1, 2025.

36.    The Notice Letter states that the "files involved included your name and one or more of the following: date of birth, address, medical record number, health insurance information, and/or treatment information." On information and belief, and as reflected in the sample notice filed by Defendants with the Massachusetts Attorney General on or about March 5, 2026, the files

obtained by the unauthorized third parties also included, for certain other Class Members, Social Security numbers.[11]

37.     The Notice Letter does not disclose: (a) the identity of the unauthorized third parties; (b) the root cause of the Data Breach; (c) the specific vulnerabilities exploited; (d) the full scope of the Private Information obtained; (e) whether the Private Information obtained was transmitted outside Defendants' systems or posted on illicit markets; (f) whether Defendants have recovered or confirmed the destruction of the Private Information; or (g) the specific remedial measures taken to prevent a recurrence.

38.     Upon information and belief, the two cybersecurity incidents described in the Notice Letter were carried out by cybercriminals who targeted Defendants' systems for the purpose of obtaining and monetizing the Private Information held on those systems. The two-window pattern, the extended access durations (several days each), and the volume of files obtained are consistent with a deliberate, targeted intrusion by cybercriminals rather than an incidental or accidental exposure.

39.     Defendants' use of passive phrases in the Notice Letter such as "gained access" and "obtained certain files" obscures rather than illuminates what occurred. On information and belief, unauthorized third parties not only viewed Plaintiff's and Class Members' Private Information but also exfiltrated (that is, downloaded and carried away) that information from Defendants' systems.

40.     The Notice Letter does not state whether Defendants contacted Class Members to investigate whether Class Members have experienced misuse of their Private Information since the Data Breach.

---

[11] Off. of the Mass. Att'y Gen., Data Breach Report No. 2026-328, Orthopaedic Institute of Western Kentucky (Mar. 5, 2026), https://www.mass.gov/doc/2026-328-orthopaedic-institute-of-western-kentucky/download.

41.     Defendants' transition of the data formerly maintained by Keystone to Mercy Health's internal systems — as described in the Notice Letter — does not remediate the harm caused by the Data Breach. The Private Information of Plaintiff and Class Members has already been obtained by unauthorized third parties and, upon information and belief, remains in those parties' possession.

42.     As a HIPAA-covered entity and business associate, respectively, Mercy Health and Keystone were required under the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400–414, to provide notice of a breach of unsecured protected health information to affected individuals "without unreasonable delay and in no case later than 60 calendar days from the discovery of the breach."[12]

43.     As described above, Defendants delayed notice to Plaintiff and Class Members by approximately six months from the end of the second unauthorized-access window. Plaintiff does not assert a private cause of action under HIPAA. These timing allegations are relevant to Defendants' unreasonable delay and to the harm that delay caused Plaintiff and Class Members in mitigating the consequences of the Data Breach.

**C. The Data Breach Was Preventable**

44.     Defendants did not use reasonable security procedures and practices appropriate to the highly sensitive nature of the Private Information they collected and maintained. Authoritative cybersecurity frameworks and federal guidance describe, in detail, the reasonable administrative, technical, and physical safeguards that Defendants should have implemented — and that, had they been implemented, would have prevented or mitigated the Data Breach.

---

[12] U.S. Dep't of Health & Human Servs., Breach Notification Rule, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Apr. 13, 2026); U.S. Dep't of Health & Human Servs., Submitting Notice of a Breach to the Secretary, https://www.hhs.gov/hipaa/for-professionals/breach-notification/breach-reporting/index.html (last visited Apr. 13, 2026).

45.     The Federal Trade Commission has published extensive, practical guidance describing reasonable information-security practices for businesses that collect and maintain personal information. The FTC's guidance — which has remained consistent for more than a decade — identifies core elements of reasonable security, including inventorying stored personal information, securely disposing of unneeded data, encrypting sensitive information, understanding system vulnerabilities, and planning ahead for breaches.[13]

46.     The FTC has also published specific guidance regarding data-breach response, which requires organizations that have experienced a breach to promptly secure systems, remediate vulnerabilities, preserve evidence, assemble a response team, coordinate with forensics and law enforcement, and provide timely notifications.[14]

47.     NIST, the federal agency that develops cybersecurity standards for civilian federal information systems and that publishes standards widely used by private industry, has published NIST Special Publication 800-53, Rev. 5, Security and Privacy Controls for Information Systems and Organizations, a comprehensive catalog of security and privacy controls covering access control, incident response, risk assessment, audit and logging, authentication, and vendor management. NIST SP 800-53 Rev. 5 is a widely recognized benchmark for reasonable security.[15]

48.     NIST has also published NIST Special Publication 800-61, Rev. 3, Incident Response Recommendations and Considerations for Cybersecurity Risk Management, which

---

[13] Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business; Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[14] Fed. Trade Comm'n, Data Breach Response: A Guide for Business (Aug. 2023), https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

[15] Joint Task Force, Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Publication 800-53, Rev. 5 (Sept. 2020) (includes updates as of Dec. 10, 2020), https://doi.org/10.6028/NIST.SP.800-53r5.

establishes current best practices for incident-response preparation, detection, analysis, containment, eradication, and recovery, aligned with the NIST Cybersecurity Framework 2.0.[16]

49.     CISA and the Multi-State Information Sharing and Analysis Center have jointly published the #StopRansomware Guide, which describes recommended controls to prevent, detect, and respond to ransomware and other data-exfiltration attacks. Those controls include reliable backups, phishing-resistant multi-factor authentication, timely patching, least-privilege access, network segmentation, robust logging and monitoring, and incident-response planning.[17]

50.     CISA also maintains the Known Exploited Vulnerabilities Catalog, a continuously updated list of vulnerabilities known to be exploited by threat actors. Timely patching of cataloged vulnerabilities is a baseline cybersecurity function that is expected of any organization handling sensitive data.[18]

51.     The Center for Internet Security publishes the CIS Critical Security Controls, a prioritized set of actionable safeguards — including asset inventory, access control, continuous vulnerability management, and incident response — that map to NIST, CISA, and other frameworks and represent consensus industry best practices for reasonable security.[19]

52.     As a HIPAA-covered entity handling protected health information, Mercy Health was also required to follow sector-specific cybersecurity guidance published by HHS. HHS's 405(d) Program has published Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients, which sets out practical safeguards addressing the healthcare sector's major

---

[16] Nat'l Inst. of Standards & Tech., Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final.

[17] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf.

[18] Cybersecurity & Infrastructure Sec. Agency, Known Exploited Vulnerabilities Catalog, https://www.cisa.gov/known-exploited-vulnerabilities-catalog (last visited Apr. 13, 2026).

[19] Ctr. for Internet Sec., CIS Critical Security Controls v8.1 (2024), https://www.cisecurity.org/controls/v8-1.

threats, including email protection, endpoint protection, access management, data protection, vulnerability management, and incident response.[20]

53.     HHS has also published the Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals, which identify the foundational and enhanced cybersecurity practices that healthcare organizations should prioritize — including vulnerability mitigation, email security, multi-factor authentication, encryption, credential management, and incident planning.[21]

54.     HHS's Office for Civil Rights maintains an extensive Security Rule Guidance archive and has published a Quick-Response Checklist that healthcare entities experiencing a cyberattack should follow to identify and respond to security incidents, mitigate harm, and document outcomes.[22]

55.     These frameworks are existing and applicable industry standards for healthcare providers and their vendors. Defendants had access to them, knew or should have known their contents, and failed to comply with them. The occurrence of the Data Breach demonstrates that Defendants failed to implement one or more of the reasonable safeguards described in the frameworks above, resulting in the unauthorized acquisition of the Private Information of, upon information and belief, thousands of individuals, including Plaintiff and Class Members.

**D. Plaintiff's Experience**

---

[20] U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf.

[21] U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf.

[22] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, My Entity Just Experienced a Cyber-Attack! What Do We Do Now? A Quick-Response Checklist (June 2017), https://www.hhs.gov/sites/default/files/cyber-attack-checklist-06-2017.pdf; U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Apr. 13, 2026).

56.     Plaintiff Donna Keyes was a patient of the Orthopaedic Institute of Western Kentucky and its successor, Mercy Health – Western Kentucky Orthopedics.

57.     As a condition of receiving orthopedic medical care at OIWK and Mercy Health, Plaintiff was required to provide her Private Information to Defendants, including, at a minimum: her name, date of birth, address, contact information, health insurance information, medical record number, medical history, and treatment information.

58.     At the time of the Data Breach — both during the April 21–26, 2025 access window and during the July 19 – August 1, 2025 access window — Defendants maintained Plaintiff's Private Information on the Keystone-hosted systems that were accessed by unauthorized third parties.

59.     Plaintiff takes reasonable care to safeguard the confidentiality of her Private Information. She stores documents containing her Private Information in secure locations, and she does not knowingly transmit sensitive information over insecure channels. Plaintiff would not have provided her Private Information to Defendants had she known that Defendants' data-security practices were insufficient to safeguard that information.

60.     Plaintiff received the Notice Letter from Mercy Health by U.S. mail in or around late February or early March 2026. The Notice Letter confirmed that Plaintiff's Private Information had been involved in the Data Breach and advised her to review her medical bills and explanation-of-benefits forms for unusual activity and to contact her insurance company or healthcare provider immediately if she observed suspicious charges or activity.

61.     Following her receipt of the Notice Letter, Plaintiff spent time reviewing the Notice Letter, researching the Data Breach and its implications, considering the steps available to her to

mitigate the risk of identity theft, and otherwise responding to the Data Breach. That time has been lost to Plaintiff and cannot be recovered.

62.     Since the Data Breach, Plaintiff has received a notification from Experian that her Private Information has been detected on the dark web. That notification informed Plaintiff — through an independent, third-party monitoring service — that her Private Information is available for purchase, trade, or misuse by cybercriminals.

63.     Since the Data Breach, Plaintiff has also experienced a significant and sustained increase in the volume of unsolicited telephone calls she receives and in the volume of unsolicited electronic-mail communications she receives. Plaintiff had not experienced that increased volume prior to the Data Breach. On information and belief, the increase in unsolicited contacts is a consequence of the unauthorized acquisition of her Private Information and its subsequent availability on illicit markets.

64.     As a direct and proximate result of the Data Breach, Plaintiff has suffered actual injury, including: (a) the unauthorized acquisition of her Private Information by cybercriminals; (b) the dissemination of her Private Information on the dark web, as confirmed by the Experian notification; (c) an increase in unsolicited telephone calls and electronic-mail communications, consistent with the targeted misuse of breached data for spam, phishing, and fraud; (d) lost time spent responding to the Data Breach and mitigating its consequences; (e) the diminution in value of her Private Information; (f) the loss of the benefit of the bargain; (g) invasion of her legally protected privacy interest in her PHI and PII; and (h) an actual, imminent, and continuing increased risk of identity theft, medical fraud, financial fraud, and other forms of misuse of her Private Information.

65.    Plaintiff's Private Information remains, upon information and belief, in the possession of cybercriminals and subject to further unauthorized use and disclosure. Plaintiff has a continuing interest in ensuring that her Private Information — which, to the extent it remains in Defendants' possession, is subject to further unauthorized acquisition absent reasonable safeguards — is protected and safeguarded.

66.    The Data Breach has caused Plaintiff anxiety, stress, and concern about the potential misuse of her Private Information, which has been compounded by Defendants' failure to disclose material details about the root cause, scope, and remediation of the Data Breach.

**E. The Data Breach Was Foreseeable**

67.    The risk of a data breach affecting a healthcare provider and its information-technology vendor was reasonably foreseeable to Defendants. Federal agencies, industry analysts, and government reports have repeatedly identified the healthcare sector as a primary target of cybercriminals and have warned healthcare organizations to implement reasonable cybersecurity safeguards appropriate to the sector's elevated threat profile.

68.    The Identity Theft Resource Center reports that the number of reported data compromises in the United States reached record highs in recent years, and that the healthcare sector continues to account for a disproportionate share of those compromises. The ITRC has further reported that healthcare-sector breaches frequently involve the exposure of sensitive PHI affecting tens of millions of individuals each year.[23]

69.    CISA and HHS have issued repeated warnings about the heightened cyber threat to the healthcare sector, including warnings specifically directed at healthcare providers and their

---

[23] Identity Theft Res. Ctr., 2025 Data Breach Report (Jan. 2026), https://www.idtheftcenter.org/publication/2025-data-breach-report/; Identity Theft Res. Ctr., 2024 Annual Data Breach Report (Jan. 28, 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/.

information-technology vendors. Those warnings have described the specific tactics, techniques, and procedures used by cybercriminals to compromise healthcare systems and have recommended specific safeguards to prevent, detect, and respond to such attacks.[24]

70.    HHS's Office for Civil Rights has specifically advised that ransomware and other cybersecurity incidents affecting covered entities and business associates trigger HIPAA breach-analysis obligations, and that healthcare entities must plan for and respond to such incidents in a manner consistent with HIPAA's Security Rule and Breach Notification Rule.[25]

71.    In the years preceding the Data Breach, numerous well-publicized data breaches affecting healthcare providers, health plans, and healthcare information-technology vendors put Defendants on notice that the Private Information they held was a known target for cybercriminals and required robust cybersecurity safeguards.

72.    Defendants knew or should have known that the Private Information they collected and stored — including names, dates of birth, addresses, medical record numbers, health insurance information, treatment information, and (for certain patients) Social Security numbers — was highly valuable to cybercriminals and was at substantial risk of acquisition if not reasonably safeguarded.

---

[24] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf; U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Fact Sheet: Ransomware and HIPAA (Sept. 20, 2021), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html; U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf; U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf.
[25] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Fact Sheet: Ransomware and HIPAA (Sept. 20, 2021), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html; U.S. Dep't of Health & Human Servs., Breach Notification Rule, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Apr. 13, 2026).

73.     At all relevant times, Defendants knew or reasonably should have known of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data-security systems were breached, including the substantial costs that would be imposed on Plaintiff and Class Members.

74.     The injuries to Plaintiff and Class Members described in this Complaint were directly and proximately caused by Defendants' failure to implement and maintain reasonable and adequate data-security measures to protect the Private Information of Plaintiff and Class Members from unauthorized acquisition.

**F. The Value of the Private Information Compromised in the Data Breach**

75.     The Private Information of Plaintiff and Class Members has substantial value to Defendants and to the cybercriminals who obtained it in the Data Breach. That is so for several reasons.

76.     First, Defendants themselves derive commercial value from collecting and processing patients' Private Information: they use that information to deliver medical services, bill patients and insurers, coordinate with third parties, and operate their businesses.

77.     Second, the Private Information compromised in the Data Breach has independent value on illicit markets, where it is bought and sold by cybercriminals for use in identity theft, financial fraud, tax fraud, medical fraud, and other crimes. Healthcare data is particularly prized because it frequently includes information — dates of birth, medical histories, health insurance identifiers — that cannot easily be changed and that enables a range of downstream frauds.

78.     Third, when the Private Information exposed includes a Social Security number — as, on information and belief, was the case for certain Class Members — the resulting risk of harm is magnified substantially. The Social Security Administration has specifically warned that a

compromised Social Security number can be used for tax fraud, benefits fraud, employment fraud, financial fraud, and other crimes, and that the effects of a compromised Social Security number may persist for years.[26]

79.     Fourth, the Private Information compromised in the Data Breach is of a type that cannot easily be "closed" or "changed." Unlike a compromised credit-card number, which can be cancelled and replaced, a compromised Social Security number, date of birth, medical record number, or medical history follows an individual for life.

80.     Fifth, the value of the Private Information to cybercriminals is enhanced when it is combined with additional information from other sources to build comprehensive profiles of individual victims — a technique cybercriminals commonly refer to as assembling "fullz" packages. The Private Information obtained in the Data Breach can be combined with information from other sources to build such profiles of Plaintiff and Class Members, increasing the risk and the severity of downstream fraud.

81.     The time lag between when Private Information is stolen and when it is misused can be substantial. The Government Accountability Office, in a frequently cited report on data breaches and identity theft, observed that stolen data may remain dormant for a year or more before being used to commit identity theft, and that fraudulent use of stolen data may continue for years after the initial breach.[27]

---

[26] Soc. Sec. Admin., Identity Theft and Your Social Security Number, Pub. No. 05-10064 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[27] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737.

82.     Federal Trade Commission research likewise confirms that misuse of stolen data may not be immediate and that the absence of immediate confirmed fraud does not negate the present risk to victims or the need for protective measures.[28]

**G. Defendants Failed to Comply with Industry and Regulatory Standards**

83.     Defendants failed to comply with the cybersecurity standards, frameworks, and regulatory expectations applicable to healthcare providers and their information-technology vendors.

84.     Specifically, Defendants failed to meet the minimum standards set forth in, among other sources: the NIST Cybersecurity Framework 2.0 and NIST Special Publication 800-53 Rev. 5; the NIST Special Publication 800-61 Rev. 3 incident-response recommendations; the CISA and MS-ISAC #StopRansomware Guide and Known Exploited Vulnerabilities Catalog; the CIS Critical Security Controls v8.1; the HHS 405(d) Health Industry Cybersecurity Practices; and the HHS Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals.[29]

85.     As a HIPAA covered entity, Defendant Mercy Health was required to implement reasonable administrative, technical, and physical safeguards to protect the confidentiality, integrity, and availability of electronic protected health information under the HIPAA Security

---

[28] Ari Lazarus, Fed. Trade Comm'n, How Fast Will Identity Thieves Use Stolen Info? (May 24, 2017), https://consumer.ftc.gov/consumer-alerts/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[29] Joint Task Force, Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Publication 800-53, Rev. 5 (Sept. 2020) (includes updates as of Dec. 10, 2020), https://doi.org/10.6028/NIST.SP.800-53r5; Nat'l Inst. of Standards & Tech., Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final; Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf; Cybersecurity & Infrastructure Sec. Agency, Known Exploited Vulnerabilities Catalog, https://www.cisa.gov/known-exploited-vulnerabilities-catalog (last visited Apr. 13, 2026); Ctr. for Internet Sec., CIS Critical Security Controls v8.1 (2024), https://www.cisecurity.org/controls/v8-1; U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf; U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf.

Rule, 45 C.F.R. Part 164, Subparts A and C. As a HIPAA business associate, Defendant Keystone was required to implement the same safeguards with respect to electronic protected health information that it received from or maintained on behalf of Mercy Health. Plaintiff does not bring a private cause of action under HIPAA. HIPAA is cited in this Complaint to establish the standard of care that Defendants owed to Plaintiff and Class Members with respect to the Private Information entrusted to them.[30]

86.    Defendants also failed to comply with reasonable security practices as described in FTC guidance to businesses that collect and maintain personal information. The FTC has published extensive guidance — including Protecting Personal Information: A Guide for Business and Start with Security: A Guide for Business — that describes the elements of reasonable security. The FTC has also long treated failures to implement reasonable and appropriate data-security measures as unfair acts or practices under Section 5 of the FTC Act, 15 U.S.C. § 45(a). This Complaint cites the FTC Act as background regulatory context only and does not assert a private cause of action under the FTC Act.[31]

87.    Defendants' failure to comply with these standards caused or contributed to the Data Breach and to the harms suffered by Plaintiff and Class Members.

**H. Plaintiff and Class Members Have Suffered Concrete Injuries**

---

[30] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Apr. 13, 2026).

[31] Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business; Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business; Fed. Trade Comm'n, Data Breach Response: A Guide for Business (Aug. 2023), https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business; Fed. Trade Comm'n, Data Security, https://www.ftc.gov/business-guidance/privacy-security/data-security (last visited Apr. 13, 2026); 15 U.S.C. § 45(a). This citation is provided as background regulatory context only. Plaintiff does not assert a private cause of action under the FTC Act.

88.     Plaintiff and Class Members have suffered and will continue to suffer concrete, particularized, and actual injuries as a direct and proximate result of the Data Breach. Those injuries include, but are not limited to, the following:

89.     The unauthorized acquisition of Plaintiff's and Class Members' Private Information by cybercriminals, which constitutes an invasion of their legally protected privacy interest in that information.

90.     Upon information and belief, and as confirmed in Plaintiff's case by her receipt of a dark-web notification from Experian, the ongoing availability of Plaintiff's and Class Members' Private Information on the dark web and on private cybercriminal forums, where that information may be bought, sold, traded, and misused for fraudulent purposes.

91.     An increase in unsolicited telephone calls, unsolicited electronic-mail communications, and other targeted solicitations consistent with the known use of breached Private Information by spammers, phishers, and fraudsters — as Plaintiff has already experienced.

92.     Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, medical identity theft, and fraud, including the cost of credit monitoring, credit freezes, credit reports, and similar protective measures.

93.     Lost time, effort, and opportunity costs spent researching the Data Breach, reviewing the Notice Letter, monitoring financial and medical accounts, changing passwords, and otherwise responding to and mitigating the consequences of the Data Breach.

94.     Diminution in the value of Plaintiff's and Class Members' Private Information, which has been exposed to the dark market and has therefore lost a portion of its value in legitimate data markets.

95.    Loss of the benefit of the bargain, in that Plaintiff and Class Members paid for healthcare services that included, as a component of their value, the reasonable safeguarding of their Private Information — safeguarding that Defendants failed to provide.

96.    Emotional distress, anxiety, and concern about the potential misuse of Plaintiff's and Class Members' Private Information, which has been compounded by Defendants' failure to disclose material details about the Data Breach.

97.    An actual, imminent, and continuing increased risk of identity theft, medical identity theft, financial fraud, tax fraud, employment fraud, and other forms of misuse of Plaintiff's and Class Members' Private Information — a risk that, as the Government Accountability Office has observed, may persist for years after the initial breach and may materialize long after the breach itself.[32]

98.    The continuing risk to Plaintiff's and Class Members' Private Information — to the extent it remains in Defendants' possession — of further unauthorized acquisition, absent the implementation of reasonable safeguards by Defendants.

99.    These injuries are not speculative. They are concrete, particularized, and — in many cases — already realized. The Federal Trade Commission recommends that victims of a data breach take a series of prompt and specific protective steps to mitigate the risk of identity theft and fraud, including placing fraud alerts, reviewing credit reports, contacting companies to remove fraudulent charges, and seeking a credit freeze. Those steps impose time and cost burdens that Plaintiff and Class Members would not otherwise have borne.[33]

---

[32] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737.

[33] Fed. Trade Comm'n, What To Do Right Away, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Apr. 13, 2026).

## V. CLASS ACTION ALLEGATIONS

100.    Plaintiff brings this action on behalf of herself and a Class, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), defined as follows:

101.    All persons in the United States whose Private Information was compromised, acquired, or accessed as a result of the Data Breach announced by Defendants in the Notice Letter dated on or about February 25, 2026 (the "Class").

102.    Excluded from the Class are: (a) Defendants, their subsidiaries, affiliates, officers, directors, and employees; (b) any entity in which a Defendant has a controlling interest; (c) the judge or magistrate judge to whom this action is assigned, and members of his or her judicial staff; and (d) legal representatives, heirs, successors, and assigns of any excluded persons.

103.    Plaintiff reserves the right to amend or modify the Class definition following discovery.

104.    Numerosity — Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of thousands of individuals whose Private Information was compromised in the Data Breach. The exact number and identity of Class Members are known to Defendants and are ascertainable from Defendants' records.

105.    Commonality — Fed. R. Civ. P. 23(a)(2). There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any questions affecting only individual Class Members. Common questions include, without limitation:

  a.  whether Defendants owed a duty to Plaintiff and Class Members to safeguard their Private Information;

b.  whether Defendants breached that duty by failing to implement and maintain reasonable data-security measures;

c.  whether Defendants' data-security practices complied with applicable industry standards, federal guidance, and regulatory expectations;

d.  whether Defendants entered into implied contracts with Plaintiff and Class Members to safeguard their Private Information, and if so, whether Defendants breached those implied contracts;

e.  whether Defendants were unjustly enriched at the expense of Plaintiff and Class Members;

f.  whether Defendants failed to provide Plaintiff and Class Members with timely and adequate notice of the Data Breach;

g.  whether Defendants' conduct proximately caused the injuries sustained by Plaintiff and Class Members;

h.  whether Plaintiff and Class Members are entitled to actual, consequential, statutory, and nominal damages, equitable relief, and declaratory and injunctive relief; and

i.  whether Plaintiff and Class Members are entitled to a declaration of Defendants' ongoing duties with respect to the Private Information in Defendants' possession.

106.    Typicality — Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of other Class Members. Plaintiff and all Class Members were injured by the same wrongful conduct: Defendants' failure to implement and maintain reasonable data-security measures, which resulted in the unauthorized acquisition of their Private Information. Plaintiff's claims and the claims of Class Members arise from the same operative facts and are based on the same legal theories. No defenses are unique to Plaintiff.

107. Adequacy — Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff has no interests antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in class-action litigation, including data-breach class actions.

108. Predominance — Fed. R. Civ. P. 23(b)(3). Common questions of law and fact predominate over questions affecting only individual Class Members. Defendants engaged in a common course of conduct affecting all Class Members: they collected Private Information, stored it on the same Keystone-hosted systems, failed to implement reasonable safeguards, and permitted the same unauthorized acquisition to occur. The common questions identified above can be resolved with common evidence applicable to all Class Members.

109. Superiority — Fed. R. Civ. P. 23(b)(3). A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Most Class Members lack the individual financial resources to pursue separate actions. The prosecution of separate actions by individual Class Members would create a risk of inconsistent adjudications and would impose a substantial burden on the courts. Class treatment presents fewer management difficulties and conserves judicial resources and the resources of the parties.

110. Rule 23(b)(2) — Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief and corresponding declaratory relief are appropriate with respect to the Class as a whole. Plaintiff seeks injunctive and declaratory relief, including an order requiring Defendants to implement and maintain reasonable data-security measures, to provide adequate notice and credit-monitoring services to Class Members, and to submit to periodic audits of their data-security practices.

111.    All Class Members are readily ascertainable from Defendants' own records, which identify the individuals whose Private Information was compromised in the Data Breach and to whom Defendants sent the Notice Letter.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
(On Behalf of Plaintiff and the Class)

112.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

113.    Defendants required Plaintiff and Class Members to provide their Private Information to Defendants as a condition of receiving orthopedic medical care, and, in the case of Keystone, accepted that Private Information for storage and processing on Keystone-hosted systems.

114.    By collecting, storing, maintaining, processing, and using the Private Information of Plaintiff and Class Members, Defendants assumed a duty of care to exercise reasonable care in safeguarding that information against unauthorized access, acquisition, use, and disclosure. That duty arose from the special relationship between Defendants and their patients, from Defendants' status as a HIPAA covered entity and business associate, from Defendants' representations to patients, from industry standards, and from the foreseeability of harm if the Private Information was not reasonably safeguarded.

115.    Defendants' duty of care included: (a) the duty to implement and maintain reasonable administrative, technical, and physical safeguards to protect the Private Information of Plaintiff and Class Members; (b) the duty to reasonably monitor Defendants' systems for unauthorized access; (c) the duty to reasonably oversee third-party vendors entrusted with the

Private Information; (d) the duty to promptly detect and contain any unauthorized acquisition of the Private Information; and (e) the duty to timely notify affected individuals of any unauthorized acquisition.

116.    The standard of care owed by Defendants is informed by, among other sources: the HIPAA Security Rule, 45 C.F.R. Part 164, Subparts A and C; the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400–414; NIST Special Publication 800-53 Rev. 5; NIST Special Publication 800-61 Rev. 3; the CISA and MS-ISAC #StopRansomware Guide; the CIS Critical Security Controls v8.1; the HHS 405(d) Health Industry Cybersecurity Practices; and the HHS Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals. Plaintiff cites HIPAA and its implementing regulations in this Count solely as a reference point for the standard of care; Plaintiff does not assert a private cause of action under HIPAA.

117.    Defendants breached their duty of care. Defendants' negligent acts and omissions include, but are not limited to:

a.  failing to implement and maintain reasonable administrative, technical, and physical safeguards appropriate to the sensitive nature of the Private Information they collected and maintained;

b.  failing to encrypt or otherwise render unreadable the Private Information stored on Keystone-hosted systems, or failing to implement equivalent safeguards of comparable protection;

c.  failing to reasonably monitor Defendants' systems for signs of unauthorized access and to detect and contain the unauthorized access promptly;

d.  in the case of Mercy Health, failing to reasonably select, vet, oversee, and audit the third-party vendor (Keystone) entrusted with the Private Information of Mercy Health's patients;

    e.   failing to comply with applicable industry standards and federal guidance regarding the safeguarding of PHI and PII;

    f.   failing to provide Plaintiff and Class Members with timely and adequate notice of the Data Breach, in a manner consistent with the requirements of the HIPAA Breach Notification Rule and applicable state breach-notification laws;

    g.   failing to promptly remediate vulnerabilities and prevent a recurrence of unauthorized access after the first access window in April 2025, as demonstrated by the occurrence of the second access window in July and August 2025; and

    h.   failing to take other reasonable measures to prevent, detect, contain, and respond to the Data Breach.

118.    It was reasonably foreseeable to Defendants that a failure to implement reasonable data-security measures would result in the unauthorized acquisition of the Private Information of Plaintiff and Class Members, and that such unauthorized acquisition would cause Plaintiff and Class Members to suffer the injuries described in this Complaint.

119.    Defendants' negligent acts and omissions directly and proximately caused the injuries suffered by Plaintiff and Class Members.

120.    Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to: (a) implement and maintain reasonable data-security measures; (b) submit to regular audits of those measures; (c) provide Plaintiff and Class Members with adequate credit-monitoring and identity-theft protection services at Defendants' expense; and (d) return, destroy, or securely safeguard any of Plaintiff's and Class Members' Private Information that remains in Defendants' possession.

## COUNT II
## BREACH OF IMPLIED CONTRACT
(On Behalf of Plaintiff and the Class)

121.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

122.    When Plaintiff and Class Members provided their Private Information to Defendants as a condition of receiving healthcare services, Plaintiff and Class Members entered into implied contracts with Defendants under which Defendants agreed, in exchange for Plaintiff's and Class Members' Private Information and payment for healthcare services, to implement and maintain reasonable measures to safeguard the confidentiality, security, and integrity of that Private Information.

123.    The existence of these implied contracts is supported by the parties' conduct and by the circumstances surrounding the exchange. Defendants collected Private Information for business purposes, including for billing, records-keeping, and clinical care. Plaintiff and Class Members provided Private Information on the reasonable expectation — consistent with Defendants' status as a healthcare provider and business associate and with industry norms — that Defendants would safeguard that information.

124.    A portion of the consideration Plaintiff and Class Members paid for Defendants' healthcare services was allocable to the reasonable safeguarding of their Private Information. Plaintiff and Class Members paid that consideration on the reasonable belief and expectation that Defendants' data-security practices complied with applicable law, regulation, and industry standards. Plaintiff and Class Members would not have provided their Private Information or paid for Defendants' services absent those implied promises.

125. Plaintiff and Class Members fully performed their obligations under the implied contracts.

126. Defendants breached the implied contracts by failing to implement and maintain reasonable data-security measures to safeguard the Private Information of Plaintiff and Class Members, and by permitting the unauthorized acquisition of that Private Information in the Data Breach.

127. Defendants further breached the implied contracts by failing to provide Plaintiff and Class Members with timely and adequate notice of the Data Breach, which would have enabled Plaintiff and Class Members to take prompt protective measures.

128. As a direct and proximate result of Defendants' breach, Plaintiff and Class Members have suffered damages, including the loss of the benefit of their bargain, out-of-pocket costs, lost time, diminution in the value of their Private Information, and the other injuries described in this Complaint.

129. Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages, and to injunctive and declaratory relief requiring Defendants to implement and maintain reasonable data-security measures going forward and to provide adequate credit-monitoring and identity-theft protection services to Class Members at Defendants' expense.

**COUNT III**
**UNJUST ENRICHMENT**
(On Behalf of Plaintiff and the Class)

130. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

131. This Count is pled in the alternative to Count II.

132.    Plaintiff and Class Members conferred a monetary benefit on Defendants by paying for healthcare services, a portion of which was attributable to Defendants' obligation to implement reasonable measures to safeguard the Private Information Plaintiff and Class Members provided.

133.    Defendants accepted and retained that benefit. Defendants used Plaintiff's and Class Members' Private Information — and the consideration paid by or on behalf of Plaintiff and Class Members — for Defendants' own commercial benefit.

134.    Defendants enriched themselves by failing to expend the resources reasonably required to safeguard Plaintiff's and Class Members' Private Information. Rather than providing the reasonable data security that would have prevented the Data Breach, Defendants retained for themselves the portion of Plaintiff's and Class Members' payments that should have been devoted to data security, and in doing so unjustly enriched themselves at the expense of Plaintiff and Class Members.

135.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the benefits unjustly conferred upon them, because Defendants failed to implement reasonable data-security measures and failed to provide the safeguarding of Private Information that was part of the consideration for their services.

136.    Defendants should be compelled to disgorge, into a common fund or constructive trust for the benefit of Plaintiff and Class Members, the portion of the payments made by or on behalf of Plaintiff and Class Members that Defendants should have devoted to reasonable data security but did not, and otherwise to provide restitution to Plaintiff and Class Members in an amount to be determined at trial.

**COUNT IV**
**DECLARATORY JUDGMENT**
(On Behalf of Plaintiff and the Class)

137.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

138.    The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

139.    An actual, present, and justiciable controversy exists between Plaintiff and Class Members, on the one hand, and Defendants, on the other hand, concerning: (a) the existence, scope, and continuing nature of Defendants' duties to safeguard the Private Information of Plaintiff and Class Members; (b) the adequacy of Defendants' current data-security practices with respect to any Private Information of Plaintiff and Class Members that remains in Defendants' possession; and (c) Defendants' obligations to provide Plaintiff and Class Members with timely and adequate notice of any future breaches and with reasonable mitigation measures.

140.    Plaintiff and Class Members remain at present and continuing risk of further harm from the unauthorized acquisition of their Private Information and from any future unauthorized acquisition of Private Information that remains in Defendants' possession.

141.    Plaintiff, on behalf of herself and the Class, seeks a declaration from this Court that: (a) Defendants owed and continue to owe a duty to safeguard the Private Information of Plaintiff and Class Members; (b) Defendants' existing data-security practices remain insufficient to discharge that duty and must be improved to meet applicable standards; (c) Defendants' existing data-security practices must be independently audited on a regular basis; (d) Defendants must provide Plaintiff and Class Members with adequate credit-monitoring and identity-theft protection services at Defendants' expense, for a period sufficient to protect Plaintiff and Class Members from the ongoing risk of misuse of their Private Information; and (e) Defendants must provide Plaintiff

and Class Members with timely and adequate notice of any future unauthorized acquisition of their Private Information.

142. A declaratory judgment would: (a) terminate the controversy regarding Defendants' ongoing duties to Plaintiff and Class Members; (b) afford Plaintiff and Class Members relief from the uncertainty and insecurity of Defendants' continuing conduct; and (c) clarify the legal relations at issue.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment in favor of Plaintiff and the Class and against Defendants as follows:

A. Certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Class as requested herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Entering judgment in favor of Plaintiff and the Class and against Defendants on each Count of this Complaint;

C. Awarding Plaintiff and the Class actual, compensatory, consequential, and nominal damages in an amount to be determined at trial;

D. Awarding Plaintiff and the Class restitution and disgorgement of the amounts by which Defendants were unjustly enriched;

E. Granting Plaintiff and the Class injunctive and equitable relief, including an order requiring Defendants to implement and maintain reasonable data-security measures, submit to regular third-party audits of those measures, and return, destroy, or securely safeguard any of Plaintiff's and Class Members' Private Information that remains in Defendants'

possession consistent with applicable medical-record retention laws and clinical obligations;

F.  Granting Plaintiff and the Class declaratory relief as set forth in Count IV;

G.  Ordering Defendants to provide Plaintiff and the Class with not less than ten years of credit-monitoring and identity-theft protection services at Defendants' expense;

H.  Awarding Plaintiff and the Class pre-judgment and post-judgment interest at the maximum rate permitted by law;

I.  Awarding Plaintiff and the Class their reasonable attorneys' fees, litigation expenses, and costs as permitted by law; and

J.  Granting such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Class, demands a trial by jury on all claims and issues so triable.

Dated: April 13, 2026

Respectfully submitted,


*/s/ Mark E. Silvey*
Mark E. Silvey (TN. Bar No. 013415)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
P: (919) 600-5003
msilvey@brysonpllc.com
lblacno@brysonpllc.com

*and*

Scott J. Falgoust (La. Bar Roll No. 33545)*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124

(919) 585-5634
sfalgoust@brysonpllc.com

*Application for *pro hac vice* forthcoming

*Attorneys for Plaintiff*